1  JEFFREY L. BORNSTEIN – 099358
   ROSEN BIEN GALVAN & GRUNFELD LLP
2  50 Fremont Street, 19th Floor
   San Francisco, California 94105-2235
3  Telephone:   (415) 433-6830
   Facsimile:   (415) 433-7104
4  Email:        jbornstein@rbgg.com

5  Attorneys for Defendant
   JAMES F. APPENRODT
6

7              UNITED STATES DISTRICT COURT

8      NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

9

| | |
|---|---|
| 10  UNITED STATES OF AMERICA, | Case No. 14-cr-0534-CRB |
| 11             Plaintiff, | **DEFENDANT JAMES APPENRODT'S SENTENCING MEMORANDUM** |
| 12         v. | **Date:  April 26, 2018** |
| | **Time:  1:30 pm** |
| 13  JAMES F. APPENRODT, | **Court;  Hon. Charles R. Breyer** |
| 14             Defendant. | |

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF CONTENTS</u>

Page(s)

INTRODUCTION ........................................................................................................... 1

I.          STATEMENT OF FACTS......................................................................... 2

II.         APPLICABLE SENTENCING GUIDELINES....................................... 4

III.       ANALYSIS OF SENTENCING CONSIDERATIONS ............................ 4

      A.     The Need to Avoid Unwarranted Sentencing Disparities Weighs Strongly Against Imposition of a Custodial Sentence ..................................... 5

      B.     The Section 3553(a)(2) Factors Do Not Support a Custodial Sentence for Mr. Appenrodt ........................................................... 7

      C.     The Nature and Circumstances of the Offense.......................................... 8

            1.      Mr. Appenrodt Was Not Motivated by Greed, Genuinely Accepted Responsibility and Agreed to Cooperate with the Government ........................................................................... 8

            2.      The Stipulated Volume of Commerce Overstates Mr. Appenrodt's Involvement in the Conspiracy ............................. 10

      D.     Mr. Appenrodt's History and Characteristics.................................................. 11

      E.     There Is No Basis for Restitution .................................................................. 13

      F.     There Is No Basis for the No Contact Or Search Special Conditions.......... 13

REMAINING OBJECTIONS/CORRECTIONS TO THE PRESENTENCE REPORT      .................................................................................................. 14

CONCLUSION.............................................................................................................. 15

[3222690.14]

# TABLE OF AUTHORITIES

Page(s)

## **Cases**

*Gall v. United States,*
  552 U.S. 38 (2007)...................................................................................... 7, 8

*Kimbrough v. United States,*
  552 U.S. 85 (2007).......................................................................................... 4

*United States v. Carty,*
  520 F.3d 984 (9th Cir. 2008) ........................................................................... 4

*United States v. Galvez,*
  No. 4:13-cr-00414-RJH .................................................................................... 6

*United States v. Giraudo,*
  225 F. Supp. 3d 1078 (N.D. Cal. 2016) ........................................................... 9

*United States v. Giraudo,*
  No. CR-14-534-CRB, 2016 WL 4073243 (N.D. Cal. Aug. 1, 2016)................. 9

*United States v. Heffernan,*
  43 F.3d 1144 (7th Cir. 1994) ......................................................................... 11

*United States v. Larsen,*
  No. 4:11-cr-00723-PJH .................................................................................... 6

*United States v. Prosperi,*
  686 F.3d 32 (1st Cir. 2012).............................................................................. 8

*United States v. Restrepo,*
  936 F.2d 661 (2d Cir. 1991) ........................................................................... 11

*United States v. Roemer,*
  No. 4:15-cr-00229-PJH .................................................................................... 6

*United States v. Stuart,*
  22 F.3d 76 (93d Cir. 1994) ............................................................................. 11

*United States v. Wan,*
  No. 4:14-cr-00604-PJH .................................................................................... 6

*United States v. Wong,*
  No. 4:11-cr-00428-PJH .................................................................................... 6

*United States v. Zepernick,*
  No. 4:14-cr-00512-PJH .................................................................................... 7

\\

\\

\\

1

## **Statutes**

2

18 United States Code

  § 3553(a)............................................................................................................ 1, 4, 10

3

  § 3553(a)(2)(C)................................................................................................ 8

  § 3553(a)(2)(D)................................................................................................ 8

4

  § 3553(a)(6)...................................................................................................... 5

5

## **Other Authorities**

6

7

United States Sentencing Guidelines

  § 2R1.1............................................................................................................ 10, 11

8

  § 2R1.1(b)(2)(A)............................................................................................ 10

  § 3B1.2(b)........................................................................................................ 4, 5

9

  § 5B1.1(a)(2).................................................................................................... 4

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 14-cr-0534-CRB

DEFENDANT JAMES APPENRODT'S SENTENCING MEMORANDUM

[3222690.14]

## INTRODUCTION

We appreciate Mr. Raju's thorough Presentence Report and Sentencing Recommendation and urge the Court to sentence Mr. Appenrodt to a non-custodial sentence of probation for a period of three years, a criminal fine of $29,669 and certain special conditions including 150 hours of community service.  It is particularly appropriate here given Mr. Appenrodt's minor role and the non-custodial probation sentences that Judge Hamilton imposed on similarly situated defendants in the East Bay bid-rigging cases.  We ask, however, that the Court not impose two of the special conditions: (1) the no contact with any of the other defendants in this case as recommended in paragraph 4 and (2) the search condition in paragraph 7.  Neither condition is justified by the facts and circumstances of this case or by the otherwise thorough justifications set forth in Mr. Raju's sentencing recommendation.  We submit that the Probation Officer's recommended sentence as modified is sufficient but not greater than necessary to achieve all of the objectives under 18 U.S.C. Section 3553(a).

Jim Appenrodt is loyal to a fault.  For most of his career in real estate, his loyalty to others served him well.  Unfortunately, it also led him to commit this offense.  When Joe Giraudo got sick and asked Mr. Appenrodt if he would stand in for him at the San Mateo County auctions, Mr. Appenrodt said "yes" without hesitation.  Mr. Appenrodt should have asked more questions before saying "yes."  Then, once he learned how things worked at the auctions, he should have stopped going.  He failed to do so.  As Mr. Appenrodt told the Court at his change of plea hearing, "I did things that were helpful to the conspiracy.  I am guilty and I'm ready to accept responsibility."  10/6/17 Tr. at 8:20-22.

That said, Mr. Appenrodt is unique among the defendants the Court will sentence in this case.  He never purchased properties for himself, acted only at the direction of Mr. Giraudo (or on one occasion, at the direction of Mr. Rezaian when he picked up envelopes from the Undercover Agent), and he received no direct financial benefit from representing Mr. Giraudo at the auctions.  He was in no sense a partner in the bid-rigging scheme, but merely Mr. Giraudo's stand-in.  He has otherwise conducted himself in a law-

1   abiding manner.  He has suffered great shame and remorse as a result of his actions here

2   and has agreed to surrender his real estate license.  Further, his involvement in this crime

3   stemmed from loyalty, not greed.  In recognition of this fact, the government and

4   Probation Officer have agreed that Mr. Appenrodt should receive a minor role adjustment.

5           For all these reasons, as well as those set forth in more detail below, we urge the

6   Court to follow the recommendation of the Probation Officer (with the exception of the

7   two special conditions discussed in more below).

8   **I.        STATEMENT OF FACTS**

9           As of 2010, Mr. Appenrodt had been working as a real estate salesman in the Bay

10  Area for about three decades.  *See* PSR ¶ 47.  In March 2010, Mr. Giraudo fell ill and

11  asked Mr. Appenrodt to attend the San Mateo County auctions on his behalf.  *Id.*

12  Mr. Appenrodt agreed to help.  *See id.* ¶ 17.  He had a longtime personal and business

13  relationship with Joe Giraudo, whom he first met in 1975.  Beginning in 2006,

14  Mr. Appenrodt listed properties for Mr. Giraudo at a discounted rate of 1% instead of the

15  standard 2.5%.  *See e.g., id.* ¶ 16.  Soon after, Mr. Giraudo gave Mr. Appenrodt a personal

16  loan to help him settle tax debts and pay off high-interest-rate obligations on his home.  *Id.*

17  ¶ 16.  By 2010, Mr. Appenrodt had repaid Mr. Giraudo and sorted out his financial

18  situation, and the two never discussed the loan again.  *Id.*  Nonetheless, Mr. Appenrodt felt

19  a strong sense of loyalty to Mr. Giraudo for helping him get through a personal financial

20  crisis.  *Id.*

21          At the auctions, Mr. Appenrodt acted as Mr. Giraudo's representative.  For the most

22  part, Mr. Appenrodt stood by himself and awaited instructions from Mr. Giraudo, which he

23  received by phone.  *Id.*  He did not purchase properties for himself and did not make

24  decisions about which properties to purchase on Mr. Giraudo's behalf.  PSR ¶ 17.  Instead,

25  he received instructions from Mr. Giraudo about how to bid on properties that Mr. Giraudo

26  wanted to purchase.  *Id.*

27          When he first started attending the auctions, Mr. Appenrodt was not aware of the

28  bid-rigging conspiracy.  PSR ¶ 17.  It was not too long, however, before he learned that

bid-rigging was taking place as part of a conspiracy that predated his own attendance at the auctions.  Mr. Appenrodt did not enter into bid-rigging agreements on his own.  *Id.* ¶ 18. He also did not participate in negotiations concerning which of the partners in any given bid-rigging agreement would end up owning the property, whether and to whom they would offer payment to refrain from bidding or stop bidding, or other such details.  *Id.* From Mr. Appenrodt's perspective, Mr. Giraudo made all of his own decisions concerning which of the properties he wanted to buy and the price he was willing to pay.

Mr. Giraudo gave Mr. Appenrodt instructions on when to bid or stop bidding.  PSR ¶ 18.  On one occasion, Mr. Appenrodt carried out Mr. Giraudo's instruction to offer a prospective bidder money to refrain from bidding.  *Id.* ¶ 17.  On another occasion, after being concerned about bad blood between Mo Rezaian and a person who turned out to be an informant, at Mr. Rezaian's request, Mr. Appenrodt agreed to collect envelopes from the Undercover Agent containing money owed to Mr. Rezaian, et al., for a prior property auction purchase.  *Id.* ¶¶ 18-19.  Mr. Appenrodt also represented Mr. Giraudo in several auctions in which Mr. Giraudo accepted money to refrain from or stop bidding, but Mr. Appenrodt did not personally retain any of the money he handled.  *Id.* ¶¶ 18-19.

In fact, Mr. Appenrodt received no direct financial benefit from the conspiracy; he benefited only to the extent that he always did before and after the conspiracy by serving as a listing agent for Mr. Giraudo.  When Mr. Giraudo purchased a property at auction and decided to resell it, Mr. Appenrodt typically listed the property, earning a discounted commission of 1%.  PSR ¶ 16.  This business arrangement predated the conspiracy and has continued since then in a number of real estate sales unrelated to the bid-rigging conspiracy.  *Id.*  Mr. Appenrodt never asked for direct compensation from Mr. Giraudo for attending the auctions on his behalf, and aside from one instance where Mr. Giraudo offered Mr. Appenrodt partial reimbursement for gasoline, he never received any money from Mr. Giraudo for the work he did on his behalf by attending the auctions.  *Id.*  In addition to what he did in San Mateo, on a few occasions, Mr. Appenrodt attended the San Francisco County auctions on behalf of Mr. Giraudo, performing the same limited role.

1    PSR ¶ 15.

2         The government's investigation became public in January 2011, and Mr. Appenrodt

3    was indicted in October 2014.  PSR ¶¶ 1, 13.  On October 6, 2017, Mr. Appenrodt entered

4    a guilty plea.  PSR ¶ 2.  He admitted to participating in 13 bid-rigging agreements in San

5    Mateo County and two in San Francisco County.  *Id.* ¶ 19.  This included six properties

6    Mr. Appenrodt helped purchase for Mr. Giraudo.  *Id.*  In his plea agreement,

7    Mr. Appenrodt pledged to cooperate fully and truthfully with the Government.  Plea

8    Agreement ¶ 17, ECF No. 270 at 8-9.  Mr. Appenrodt was interviewed by the Government

9    after pleading guilty.  PSR ¶ 20

10   **II.      APPLICABLE SENTENCING GUIDELINES**

11        Mr. Appenrodt agrees with the Sentencing Guidelines calculations in the

12   Presentence Report.  He has no criminal history.  PSR ¶ 40.  The applicable Guidelines

13   range, based on an adjusted offense level of 11 and a criminal history category of I, results

14   in a range of 8 to 14 months.  *See* PSR ¶ 59.  This range falls within Zone B of the

15   Sentencing Table, which means a sentence of probation is authorized.  *See id.*; U.S.S.G.

16   § 5B1.1(a)(2).  Importantly, both the government and the Probation Officer agree that

17   Mr. Appenrodt should receive a two-level minor role adjustment under § 3B1.2(b).

18   **III.     ANALYSIS OF SENTENCING CONSIDERATIONS**

19        In determining the appropriate sentence, the Court applies the statutory sentencing

20   factors set out in 18 U.S.C. § 3553(a).  *United States v. Carty*, 520 F.3d 984, 991 (9th Cir.

21   2008) (en banc).  The Court has broad discretion to grant a downward variance from the

22   guidelines range.  *See Kimbrough v. United States*, 552 U.S. 85, 101 (2007).  There are

23   several factors weighing in favor of a non-custodial sentence for Mr. Appenrodt: the need

24   to avoid unwarranted sentencing disparities; the sufficiency of probation in achieving a

25   sentence "sufficient, but not greater than necessary" to comply with the purposes of

26   sentencing, 18 U.S.C. § 3553(a); the nature of the offense, including Mr. Appenrodt's lack

27   of any criminal history before or since this incident; the collateral consequences of his

28   conviction here to include agreeing to surrender his real estate license; and the fact that the

[3222690.14]

agreed upon volume of commerce calculation has the effect of exaggerating Mr. Appenrodt's criminal conduct in this case.

### A. The Need to Avoid Unwarranted Sentencing Disparities Weighs Strongly Against Imposition of a Custodial Sentence

Under 18 U.S.C. § 3553(a)(6), the sentencing judge "shall consider . . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Based on the government's large-scale prosecution of bid-rigging activities at foreclosure auctions throughout the Bay Area, the Court has numerous points of comparison to assist it in determining the appropriate sentence for Mr. Appenrodt. Specifically, Judge Hamilton has now sentenced over three dozen defendants in connection with bid-rigging activities at foreclosure auctions in Alameda and Contra Costa counties. The anti-competitive conduct in the East Bay cases was similar to, and in some ways, perhaps more egregious than the bid-rigging conspiracies at issue here.[1]

Among the East Bay defendants, we are aware of six individuals who are similarly situated to Mr. Appenrodt where the government and Probation Officer recommended a minor role adjustment under § 3B1.2(b). Our review of the sentencing memoranda for these six individuals indicates that they too worked at the direction of someone else, operating with little or no independent authority, and did not personally purchase any properties or retain illegal payoffs. Like Mr. Appenrodt, each of them ultimately accepted responsibility and pled guilty. In all six cases, Judge Hamilton sentenced the defendants to three years' probation with no term in custody:

- **Irma Galvez** was "'employed by and under the supervision of Stanley Kahan . . . . She attended the public auctions and placed bids, as directed by Kahan. Galvez had no independent authority at the auctions,'" and "'did not receive any additional compensation for participating in the offense conduct'" beyond the hourly wage she earned as an employee of Mr. Kahan.

[1] For instance, there were secondary auctions conducted by the conspirators in the East Bay.

[3222690.14]

Irma Galvez's Sentencing Memorandum, *United States v. Galvez*, No. 4:13-cr-00414-RJH, ECF No. 40 at 1 (quoting PSR).  Ms. Galvez's probation officer acknowledged that her volume of commerce figure "'severely overstates her involvement as the properties were selected by her employer, and she received no proceeds from the illegal scheme.'"  *Id.* (quoting PSR).  Like Mr. Appenrodt, her adjusted offense level was 11.  Ms. Galvez received no jail time.

- **Eric Larsen** "acted as a proxy for George and Terry Cheng," who were major players in the East Bay auctions, "never bid during the auctions without instructions from his employer," "had little role in collecting or paying round profits," and aside from a salary he received from his employer, "received no share of the round payments."  United States' Sentencing Memorandum, *United States v. Larsen*, No. 4:11-cr-00723-PJH, ECF No. 43 at 2.  Like Mr. Appenrodt, his adjusted offense level was 11.  Mr. Larsen received no jail time.

- **Bradley Roemer** participated in non-competitive auctions for a period of eleven months, purchasing seven properties for his father's companies and accepting payoffs for not bidding on four other properties.  *See* Defendant's Sentencing Memorandum, *United States v. Roemer*, No. 4:15-cr-00229-PJH, ECF No. 33 at 6.  Mr. Roemer's "'conduct was on behalf of his father and all of the illegal profits derived were passed on to his father's companies.'"  *Id.* (quoting PSR).  His father also held decision-making authority.  *Id.*  Like Mr. Appenrodt, his adjusted offense level was 11.  Mr. Roemer received no jail time.

- **Garry Wan** "was a regular participant in the Alameda County bid-rigging conspiracy for nearly three years," purchasing 46 properties for his employers, the Chengs, with an aggregate value of $10.9 million.  United States' Sentencing Memo, *United States v. Wan*, No. 4:14-cr-00604-PJH, ECF No. 33 at 2.  However, he "act[ed] as little more than a messenger on behalf of the Chengs, doing only, and exactly, as he was instructed by George's wife Terry to do.  He had no financial interest in these transactions, and no discretion or autonomy."  Defendant Garry Wan's Sentencing Memo, *United States v. Wan*, No. 4:14-cr-00604-PJH, ECF No. 32 at 2.  His adjusted offense level was 13.  Mr. Wan received no jail time.

- **Jorge Wong** participated in the Alameda County bid-rigging conspiracy while working for his uncle's real estate company.  When solicited to participate in the post-auction rounds, Mr. Wong "would report this to his uncle over the phone, who would then make the decision whether to participate."  United States' Sentencing Memorandum, *United States v. Wong*, No. 4:11-cr-00428-PJH, ECF No. 53 at 2.  The Government agreed to

recommend a minor rule adjustment for Mr. Wong "based on [his] more limited participation in the conspiracy at the direction of a family member." *Id.* at 5.  Like Mr. Appenrodt, his adjusted offense level was 11.  Mr. Wong received no jail time.

- **Gernot Zepernick** was a salaried employee of a company owned by the Chengs.  While attending auctions, "Zepernick was on the phone with the [] office and would receive instructions on which properties to bid, whether to agree to stop bidding and hold a round, and how much to bid."  United States' Sentencing Memorandum, *United States v. Zepernick*, No. 4:14-cr-00512-PJH, ECF No. 27 at 2.  He collected and distributed payoffs, but "did not keep the money and always handed it over to someone at the [] office." *Id.*  He "purchased 29 properties on behalf of his employer worth approximately $6.39 million." *Id.*  Like Mr. Appenrodt, his adjusted offense level was 11.  Mr. Zepernick received no jail time.

The need to avoid unwarranted sentencing disparities is particularly relevant here. *See* PSR ¶ 77.  In his detailed Sentencing Recommendation, Mr. Raju highlights those factors that demonstrate why a sentence of probation is appropriate including:  the need to avoid sentencing disparities, Mr. Appenrodt's clean record, his work history that began when he was 8 years old, his steady employment at Laurel Realty since 1981, his minor role in the conspiracy, the fact that he "did not have decision-making authority or directly profit from the payoffs or resale of the rigged properties" other than earning a 1% listing agent commission on properties listed by Mr. Giraudo.  *See*, SR at Page 2.  He also specifically rejected the need for location monitoring given his lesser role in this case.  Id at 3.  We urge this Court to follow the probation Officer's sentencing recommendation with the exception of the two special conditions that are not warranted here.

**B.    The Section 3553(a)(2) Factors Do Not Support a Custodial Sentence for Mr. Appenrodt**

The purposes of sentencing will be achieved if the Court imposes a non-custodial sentence on Mr. Appenrodt.  Sentencing a defendant to probation is not "an act of leniency." *Gall v. United States*, 552 U.S. 38, 44 (2007).  Probation is a punitive measure, and "may be used as an alternative to incarceration, provided that the terms and conditions of probation can be fashioned so as to meet fully the statutory purposes of sentencing,

[3222690.14]

1    including promoting respect for the law, providing just punishment for the offense,

2    achieving general deterrence, and protecting the public from further crimes by the

3    defendant." U.S.S.G., ch. 5, pt. B, introductory cmt.  A probationary sentence would

4    "substantially restrict [Mr. Appenrodt's] liberty," *Gall*, 552 U.S. at 48, and will serve a

5    punitive and deterrent effect without the need for incarceration.

6         Moreover, a sentence of probation would be sufficient to protect the public from the

7    possibility of future offenses by Mr. Appenrodt.  *See* 18 U.S.C. § 3553(a)(2)(C).  After

8    entering his guilty plea, Mr. Appenrodt voluntarily initiated the process to surrender his

9    real estate license and is now mostly retired from the real estate business.  PSR ¶ 47  As

10   described in more detail below, Mr. Appenrodt had a clean record before this offense and

11   in the seven years since the investigation became public.  He feels great shame about his

12   conduct and conviction here.  *Id.* ¶ 24.  The public would derive no benefit from

13   incarcerating him or punishing him further.  Likewise, there is no need to provide

14   Mr. Appenrodt with education or vocational training, medical care, or correctional

15   treatment.  *See* 18 U.S.C. § 3553(a)(2)(D).

16        **C.    The Nature and Circumstances of the Offense**

17        The nature and circumstances of Mr. Appenrodt's offense further demonstrate why

18   a custodial sentence would not be appropriate.

19              **1.    Mr. Appenrodt Was Not Motivated by Greed, Genuinely
                       Accepted Responsibility and Agreed to Cooperate with the
20                     Government**

21        There are several ways in which Mr. Appenrodt's guidelines range exaggerates the

22   nature and circumstances of the offense.  Alone among the defendants this Court will be

23   sentencing, and in contrast to the East Bay defendants who received minor role

24   adjustments but were paid a wage or salary for their work, Mr. Appenrodt received no

25   direct compensation.  *See United States v. Prosperi*, 686 F.3d 32, 44 (1st Cir. 2012)

26   (district court properly considered fact "that the defendants did not seek to enrich

27   themselves personally and did not personally benefit from the scheme").  Although

28   Mr. Appenrodt received partial reimbursement for some of his travel costs, this actually

highlights the fact that, on balance, he was not making money by representing Mr. Giraudo at the auctions.  His agreement with Mr. Giraudo to sell properties at a discounted listing rate of 1% both pre- and post-date his involvement in the offense.

In addition, Mr. Appenrodt's acceptance of responsibility goes beyond the mere agreement to plead guilty.  At his change of plea hearing, Mr. Appenrodt gave a forthright summary of his offense conduct and told the Court that "I am guilty and I'm ready to accept responsibility."  10/6/17 Tr. at 8:9-22.  Likewise, the Probation Officer observes that Mr. Appenrodt discussed in his presentence interview his "deep remorse and regret for his actions" and that "he is ashamed of what he did."  PSR ¶ 24.  We ask the Court to consider Mr. Appenrodt's genuine acceptance of responsibility in fashioning an appropriate sentence.

Although Mr. Appenrodt was not an early cooperator, his decision to assert his constitutional rights before pleading guilty furthered the interests of justice and the public at large and should not be used against him.  Along with Mr. Giraudo and their three other co-defendants, Mr. Appenrodt litigated the motion that resulted in this Court's order suppressing the illegal recordings captured outside the San Mateo County Courthouse. That Order, and the published Order clarifying the defendants' standing to challenge the illegal recordings, are important decisions at the cutting edge of the law governing electronic surveillance.  *See United States v. Giraudo*, 225 F. Supp. 3d 1078 (N.D. Cal. 2016); *United States v. Giraudo*, No. CR-14-534-CRB, 2016 WL 4073243 (N.D. Cal. Aug. 1, 2016).  In addition, by refusing to plead guilty to inappropriate mail fraud charges, Mr. Appenrodt and his four co-defendants won a significant victory for all the defendants in this case when the government decided to dismiss the mail fraud charges *en masse*. None of that would have happened had Mr. Appenrodt and Mr. Giraudo and their other co-defendants not discovered the wrongdoing buried in the government's reports and filed a motion to suppress.  *See* ECF No. 177.

/ / /

/ / /

## 2. The Stipulated Volume of Commerce Overstates Mr. Appenrodt's Involvement in the Conspiracy

Mr. Appenrodt stipulated to a volume of commerce totaling $2,134,447. PSR ¶ 19. That figure is based on six properties that Mr. Appenrodt assisted Mr. Giraudo in purchasing. *Id.* Mr. Appenrodt agrees that his volume of commerce is $2,134,447 and that this figure adds two points to his adjusted offense level pursuant to U.S.S.G. § 2R1.1(b)(2)(A). However, because the stipulated volume of commerce overstates Mr. Appenrodt's involvement in the conspiracy, we urge the Court to take into consideration this overstatement in fashioning an appropriate sentence.[2]

Section 2R1.1, the antitrust sentencing guideline, explains that "[f]or purposes of this guideline, the volume of commerce attributable to an individual participant in a conspiracy is the volume of commerce done by him or his principal in goods or services that were affected by the violation." As discussed, Mr. Appenrodt did not purchase properties for himself, only for Mr. Giraudo. *See* PSR ¶ 17. There was no commerce "done by" Mr. Appenrodt directly, only commerce "done by" Mr. Giraudo, "his principal." *See* U.S.S.G. § 2R1.1.

There are two ways in which Mr. Appenrodt's stipulated volume of commerce, and the resulting two-level increase to his offense level, overstate his involvement in the conspiracy.

First, if any of the six properties attributed to Mr. Appenrodt's volume of commerce were *also* counted towards Mr. Giraudo's volume of commerce (or that of any of the other defendants), it would constitute double-counting, which is disfavored under the guidelines.[3] As the Sentencing Commission explains in its commentary, if a defendant

---

[2] Although he stipulated to this volume of commerce as part of his plea agreement, Mr. Appenrodt did not waive his right to argue this point under § 3553(a).

[3] For purposes of checking Mr. Appenrodt's property list against those of other defendants, the properties attributed to Mr. Appenrodt's volume of commerce are 131 Alexander (footnote continued)

1  agrees to submit a rigged bid that he does not in fact win, "his volume of commerce would

2  be zero," indicating that a given sale should be attributed only to the winning bidder and

3  not to co-conspirators.  *See* U.S.S.G. § 2R1.1 cmt. n.6; *see also United States v. Heffernan*,

4  43 F.3d 1144, 1148 (7th Cir. 1994) (Posner, J.) ("For purposes of determining the amount

5  of commerce, the guideline counts every sale just once.").

6       Second, even if there is no double-counting, the two-level increase Mr. Appenrodt

7  will receive for his volume of commerce exaggerates the gravity of his offense conduct.

8  Mr. Appenrodt had no control over which properties would end up being formally

9  purchased by Mr. Giraudo – as opposed to one of the other partners in the conspiracy – and

10  thus count towards his stipulated volume of commerce.

11       In fashioning an appropriate sentence, even though the stipulated guidelines range is

12  the appropriate starting point, the fact that Mr. Appenrodt did not purchase, make the

13  decision to purchase or otherwise share in the risk or reward of making that purchase is a

14  further differentiator in terms of evaluating the volume of commerce adjustment agreed to

15  in this case.  *Cf. United States v. Restrepo*, 936 F.2d 661, 667 (2d Cir. 1991) (holding, in

16  the related context of downward departures, that "where, as here, an offense level has been

17  extraordinarily magnified by a circumstance that bears little relation to the defendant's role

18  in the offense" a lower sentence "may be warranted on the ground that minimal

19  participation exists to a degree not contemplated by the guidelines"); *United States v.*

20  *Stuart*, 22 F.3d 76, 83 (93d Cir. 1994) (same).

21      **D.**    **Mr. Appenrodt's History and Characteristics**

22       Mr. Appenrodt has worked since the age of 8, and started working in real estate in

23  1971, when he was 19 years old.  PSR ¶¶ 46-47  Prior to this case, and over the course of

24  his lengthy career, Jim had a clean record with the Bureau of Real Estate and as a notary

25

26

27  Avenue, Daly City; 40 Highland Avenue, Daly City; 637 Foothill Drive, Pacifica; 91 El
Portal, Daly City; and 2250 33rd Avenue, San Francisco.

28

public registered with the Secretary of State.  But for this case, he has never been accused of any wrongdoing nor has he ever been arrested or convicted of any crime.  After pleading guilty, Mr. Appenrodt voluntarily surrendered his real estate license and let his notary public license expire.  *Id.*  ¶ 54.  He is now mostly retired.  *Id.* ¶ 47

Mr. Appenrodt and his wife have three adult children, with whom he is very close.  PSR ¶ 49.  Two of them live in the Bay Area.  *Id.* ¶ 48.  Although Mr. Appenrodt's family remains supportive, his involvement in this criminal activity and subsequent prosecution has been stressful, has negatively impacted his business reputation, and has caused feelings of shame and regret.  *See id.* ¶¶ 24, 51.

Letters of support from Mr. Appenrodt's family and friends detail his positive impact on their lives and explain why his criminal conduct was so out of character.  All of the letters describe a devoted family man who is loved by all around him.  *See* **Exhibits A-H**.  In a particularly moving letter, Mr. Appenrodt's sister-in-law Lana discusses how Mr. Appenrodt reacted when his brother Ed fell ill and died at a young age, stepping in to help with the couple's four children and orchestrating "everything from grand gestures to the mundane details of everyday life."  **Exhibit A**.  Other letters describe Mr. Appenrodt's penchant for organizing luncheons for elderly friends and neighbors and reminiscing with them about the "old days."  *See* **Exhibits B and C**.

Some of the letters hint at how Mr. Appenrodt's unwavering loyalty may have led to his involvement in the offense, and they discuss how Mr. Appenrodt has sought to change his life in response to the criminal charges.  Mr. Appenrodt's son Jeff suspects that his father's tendency to "go[] out of his way for others" led him to agree to attend property auctions on behalf of his Mr. Giraudo, who was ill at the time.  **Exhibit B**.  Mr. Appenrodt's brother Joe discusses how, as a result of his involvement in criminal activity, "Jim's reputation has been tarnished and I know that he felt humiliated and remorseful.  Jim has spent the last few years on a quest to rebuild and redeem himself.  This has included creating a more balanced life and an even more thoughtful approach to his entire family."  **Exhibit C**.  Walter Renner, a friend of Mr. Appenrodt's for nearly 50

1  years, relates how, as a result of this incident, Mr. Appenrodt has gone from a relentless

2  worker whom people called "Mr. 24-7" and "Superman" to "spend[ing] a lot more time

3  with family and friends . . . . He still spends some time at his office but I would say he is

4  semi-retired." **Exhibit D.**[4]

5        **E.        There Is No Basis for Restitution**

6        The government has agreed not to seek restitution.  *See* Plea Agreement ¶ 11, ECF

7  No. 270 at 6.  The Probation Officer agrees, noting that Mr. Appenrodt did not personally

8  retain any payoff money, and observing that it would be impossible to determine the

9  amount of restitution owed to the bank for any particular property.  PSR ¶¶ 22, 69.

10       **F.        There Is No Basis for the No Contact Or Search Special Conditions**

11       The Presentence Report recommends that Mr. Appenrodt have no contact with any

12  of the other co-defendants in this case.  It also recommends a search condition.  Neither is

13  warranted here and should not be included in the sentence to be imposed by this Court.

14       First, this investigation became public in January 2011 and Mr. Appenrodt was

15  indicted in 2104.  There has been no claim by the Government that there was any

16  continuing conspiracy, improper contacts, other crimes or anything else that would give

17  rise to either suggested condition.  Importantly, despite his otherwise thoughtful

18  explanation for his sentencing recommendation, there is nothing that supports either

19  condition in the 5 page sentencing recommendation made by Mr. Raju.  Throughout the

20  7 years that this matter has been pending, Mr. Appenrodt has been in contact with many of

21  the people, especially, Mr. Giraudo, that the Probation Officer now recommends he stay

22  away from.

23       Second, there is no suggestion that Mr. Appenrodt has done anything in the past 7

24  years that would give rise to a search condition.  There is no ongoing crime or even any

25

26  ─────────────────────

27  [4] Additional letters are attached as Exhibit E (his daughter), Exhibit F (his wife), Exhibits G-H (two close personal friends).

28

1  concern that there might be.  Nor is there any suggestion of any other demonstrated need

2  on any other basis for such a condition.  If there is a concern about the payment of the fine,

3  we suggest making the fine payable within 30 days.  Once paid, even that purported

4  justification evaporates.

**REMAINING OBJECTIONS/CORRECTIONS TO THE PRESENTENCE REPORT**

7  The Probation Officer made many of our suggested corrections and objections to

8  the draft Report but we note the following areas that still need to be addressed:

9  Paragraph 16.  Mr. Appenrodt made the arrangement with Mr. Giraudo to reduce

10  his listing fee to 1% beginning in 2006 and continuing to the present.  Also, while

11  Mr. Appenrodt does not dispute that Mr. Giraudo loaned him money when he needed it –

12  and the loan was eventually repaid in full – he did feel a tight bond with Mr. Giraudo for

13  helping him out when the chips were down.  The "moral" obligation described at the end

14  of ¶ 16 was really more of a sense of loyalty to a close friend who needed his help rather

15  than any quid-pro-quo.

16  Paragraph 20.  In his initial statements to the FBI, he was confronted with their

17  assertions that he had paid off others and/or had been paid off by them as part of the bid

18  rigging activities in this case.  He appropriately denied these allegations.

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

[3222690.14]

1

## CONCLUSION

2        For the foregoing reasons, Mr. Appenrodt respectfully requests that the court

3    impose the Probation Officer's suggested sentence of three years' probation on condition

4    he perform 150 hours of community service and pay a fine of $26,669 along with those

5    other special conditions requested with the exception of the no contact and search

6    conditions in paragraphs 4 and 7 in the sentencing recommendation addendum to the PSR.

7    DATED:  April 19, 2018                    Respectfully submitted,

8                                             ROSEN BIEN GALVAN & GRUNFELD LLP

9                                             By:  _____/s/ Jeffrey L. Bornstein_____

10                                                  Jeffrey L. Bornstein

11                                           Attorneys for Defendant
                                             JAMES F. APPENRODT

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

E X H I B I T   A

Honorable Charles R. Breyer USDC

Northern District of California

450 Golden Gate Avenue,

17th Floor San Francisco, CA 94102

2/01/2018

Your Honor,

I first met James Appenrodt when I was fifteen years old. A shy teenager from an overprotective Russian-American family, I was introduced to "Jimmy" during a family dinner at which I was a guest of his eldest brother Edward. James and Edward were part of a boisterous Irish Catholic family that prized loyalty, hard work, and strength of conviction. That first night, Jim peppered me with questions about my family, my friends, my career goals, and my intentions with his brother. Even as the younger brother, Jim was fiercely protective of his brother, and yet he was also the member of the family that made me feel the most welcome. I have known Jim now for 55 years, and this unwavering loyalty and generous spirit have continued to grow to create a man that I am proud to call my brother-in-law.

My husband Edward and I had four beautiful children. Tragically, Edward became very sick at a young age and eventually passed away in 1991. Jim provided a crucial support system for myself and my children. He coached my eldest son's Little League baseball team after my husband had signed up but was too ill to continue, and would constantly check in with the family to do whatever was needed. This encompassed everything from grand gestures to the mundane details of everyday life.

A busy husband and father of three, Jim tirelessly worked to support his immediate family, and grow his business, while also ensuring that the extended family remained tied together. After his father, the patriarch, passed away in 1995, Jim took on this role in many ways.  I am probably most impressed by his sincere devotion to his family. This includes my children, and all of his cousins, and nieces and nephews. He is a deeply sentimental man, and this love is genuine.

Of course, as many great men are, Jimmy is flawed as well. In his pursuit of material comforts, he did not honor the legal and moral practices of his industry. I know that he is deeply regretful of bringing any kind of shame to his family, and I would implore that you factor in his generous and loving heart and spirit. As a patriarch of a family that has faced much adversity, Jim's presence in our lives not only enriches us all, but allows us the strength and courage to pursue our individual destinies, knowing that his love is a constant and pure truth.  Please do not hesitate to contact me with any questions.

Sincerely,

Lana Appenrodt
lappenrodt@gmail.com
650-307-2369

E X H I B I T   B

February 12, 2018


Honorable Charles R. Beyer
USDC, Northern District of California
450 Golden Gate Avenue, 17th Floor
San Francisco, CA  94102


Honorable Charles R. Breyer,

I am proud to begin this letter by saying that Jim Appenrodt is not only my father, but also one of my best friends.  I am 34 years old, the oldest child of three and his only son.  He is a true family man and has always made me feel greatly loved and supported since the day I was born.  I have always had a close and loving relationship with my father.

Since childhood, I have realized how very fortunate I am to have Jim as a father.  At a very young age he taught me how to play every sport and even had a set of his own golf clubs cut down to teach me golf.  We would always play sports together in the front yard and often the neighborhood kids would join in the fun.  One day a neighborhood boy rang our doorbell and instead of asking to play with me, asked my mom, "Can Jim come out and play?"  We still laugh about that now… my dad was a hit in the neighborhood!  At the end of the day, I would play outside with my baseball glove, waiting excitedly for my dad's arrival home to play catch, shoot basketball hoops, or chip golf balls.  He always called me his little "buddy."

My Dad enjoyed sharing his love of sports with me.  He coached my little league teams and took me to countless Giants, Warriors, and 49er games.  He took my friends and I on golf trips, barbecued for us and always showed us a great time.

When I graduated from high school, I decided to go into real estate.  My father was a great mentor.  All of his clients, colleagues and peers always respected him and grew to respect me.  It impressed me how he made time for everyone who needed him.  He looked out for his elderly friends and clients, going out of his way to always arrange luncheons, pick them up and make sure they got to visit and reminiscence about the "old times."  He even visited clients in rest homes or hospitals showing his compassion and concern.

My father truly values family and family traditions.  He always tells great stories of his parents, siblings and childhood days.  He finds it important to keep in touch with all family members and be the leader of many gatherings bringing so many others together.

As I have seen my entire life, my father truly goes out of his way for others. With regard to these criminal charges, I know that he was just acting on behalf of Mr. Joe Giraudo, who was ill at the time.  At Mr. Giraudo's request and per his instructions, my father, acting as a representative for Mr. Giraudo, was attending the property auctions.  I know my father had never intended to purchase any of these properties for himself, nor did he use any of his own funds.  He did not realize he was doing anything illegal.

His love for family and tradition, endless loyalty and generosity, taking care of others and making people happy are what he is all about.  I am very proud that I have had the opportunity to work with my father and learn the old-fashioned way of loyal "hands on" business with clients.

I am and always have been very proud to call Jim Appenrodt, my father.

Yours truly,

Jeff Appenrodt
294 29th Street
San Francisco, CA 94131

E X H I B I T    C



February 5,2018
Honorable Charles R. Breyer
USDC, Northern District of California
450 Golden Gate Avenue 17th Floor
San Francisco, CA 94102

Dear Honorable Judge Breyer

I am writing in regard to my brother, Jim Appenrodt. As an older brother, Jim was always present in my life. He was my best man, helped me find my first house and gave me the down payment. Jim has stayed close to both my daughters and has been a strong and positive influence on their lives. Throughout our lives, Jim has always been there whenever our family or friends needed help. When my older brother Ed was dying of cancer at forty three (43) Jim provided emotional and financial support to Ed, his wife and four children. This support has continued to this day.

Jim has been an active member of his community throughout his life. He has been a coach and mentor to many young men and women in Marin County. In his work community- the Noe Valley- Jim organizes lunches and dinners on a regular basis that include many Noe Valley residents/seniors and provides an opportunity to get out and share stories about the good old days. I have attended many of these events and they are great.

I know Jim deeply regrets his decision in committing the crime. His actions have had an effect on his family and friends. Jim's daughter was an intern at the Department of Justice at the time of his indictment and had to inform her supervisor of her father's indictment. Jim's reputation has been tarnished and I know that he felt humiliated and remorseful. Jim has spent the last few years on a quest to rebuild and redeem himself. This has included creating a more balanced life and an even more thoughtful approach to his entire family. I think this is a reaction to the crime he committed.

I believe in Jim-I always have. I know he made a big mistake and he is also aware of that fact. Jim will continue to do good things and maybe even more because of what happened. Thank you for your consideration regarding Jim.

Sincerely,

Joe Appenrodt

APPENRODT
COMMERCIAL
PROPERTIES

4375 Capitola Road
Capitola, CA 95010

831.234.8554 O
831.465.9195 F

www.AppenrodtCommercial.com

E X H I B I T   D

February 5, 2018

Honorable Charles R. Breyer
USDC, Northern District of California
450 Golden Gate Avenue, 17th Floor
San Francisco, Ca.  94102

Re:  Jim Appenrodt

Dear Honorable Judge Breyer,

My Name is Walter Renner.  I have been in the real estate business for the last 55 years.  I own Walter Renner & Co. Real Estate located at 1243 Broadway in Burlingame, CA.  I am writing this letter on behalf of my friend and colleague Jim Appenrodt in hopes that you have a more personal understanding of his character.

I first met Jim in 1967 at the San Francisco Real Estate Board Golf Tournament in Pebble Beach.  I could see right away that he was a go-getter.  Shortly thereafter he brought me an offer on one of my properties and we have been doing business together ever since.  I consider Jim to be one of my best friends.  He has great integrity.  His word is his bond and you can always depend on him to get the job done.  Jim is a wonderful family man and very involved in sporting events with family and friends.

I find it hard to believe that Jim committed a crime as it is very out of character for him.  I don't think he realized what he was getting himself into.  My understanding is that he was just bidding on a property for the real buyer and if he was successful he would get the listing on that property and then make a commission.  I truly believe this has taught Jim a great lesson and you would not have to worry about him ever doing anything like this again.

We use to call Jim Mr. 24-7.  We even have a friend that called him Superman as he was always looking to make a deal.  Since this incident has happened, I see quite a few changes in Jim.  He spends a lot more time with family and friends.  He plays golf three to four times a week and goes to the Bay Club to work out on a daily basis.  He still spends some time at his office but I would say he is semi-retired.

In my opinion, Jim is a good man, a God loving man and a wonderful friend.  I hope this letter will be helpful for you in making a fair decision.

Thank you,

Walter Renner

E X H I B I T   E

**Juliana Appenrodt**
1750 Beach Street #15
San Francisco, CA 94123
juliana.appenrodt@gmail.com

February 10, 2018

Honorable Charles R. Breyer
USDC, Northern District of California
450 Golden Gate Avenue, 17th Floor
San Francisco, CA 94102

Your Honor,

I'm lucky enough to call Jim Appenrodt my dad. I'm his middle child, his first girl, his "Rose." My dad has always loved to give us nicknames—some silly, others sweet—and in my 28 years, I've been the recipient of countless Dad-invented monikers. Some stick, others get used just once or twice, but with every newly minted nickname, one thing shines through: my dad's thoughtful, loving nature.

My entire life, I've watched my dad work hard to make everyone around him happy. That's all he ever really wants—to see the people he cares about smile. As a kid, that meant bringing me home my favorite raviolis for dinner, or telling anyone that would listen the story of my heroic second-grade softball catch. He spent years coaching me and and my friends in soccer, softball, and basketball, teaching us how to play our best while still having a blast. And when I joined an adult softball league my first year living in San Francisco, my dad couldn't wait to fall back into his old role, taking my entire team out to a baseball diamond to brush up on our skills before the first game.

My dad has always cherished sharing his love of sports with us, but even more than that, I know he just cherishes the chance to spend time with us. Family has always been extremely important to my dad, and he's kept incredibly close relationships with his siblings, cousins, aunts, uncles, nieces, and nephews throughout the years. His parents passed away when I was young, but I got to watch how kind and compassionate he was with my other grandma, his mother-in-law, as she got older. Towards the end of her life, he would stop by to see her almost daily, helping to feed her and keep her company, brightening the long days she spent mostly sitting in her favorite chair. My grandma adored him.

I've watched my dad win the adoration of so many people throughout my lifetime—people young and old, everywhere from the office to our favorite restaurants. My first real job the summer after my freshman year of college was working with my dad and brother in their real estate office. From the many clients and associates who would walk through the door, I got to hear just how much they loved working with my dad—and it was evidenced by how long he'd been in many of these people's lives.

Both at home and at work, I've seen firsthand how my dad approaches life, and I truly believe that he wouldn't knowingly do anything in his business dealings that was against the law. My dad is many things—generous, caring, funny—but he is not, at heart, a criminal. He's a good man, a loving dad, and one of my biggest cheerleaders—on the softball field and in life.

Sincerely,

Juliana Appenrodt

E X H I B I T   F

FEBRUARY 1, 2018


Honorable Charles R. Beyer
USDC, Northern District of California
450 Golden Gate Avenue, 17th Floor
San Francisco, CA  94102


To the Attention of:  Honorable Charles R. Breyer


I had the good fortune to meet James Felix Appenrodt almost 40 years ago.  On February 13, 2018, we will celebrate our 36th Wedding Anniversary.  James (Jim) and I are the proud parents of three children, Jeffrey (34), Juliana (28) and Joelle (24) Appenrodt.  Jim and I were both raised with strong family values.  Our children have been a source of incredible joy and pleasure for which Jim and I share enormous pride.

Jim has always been a hard working individual dedicated to providing for his family.  Jim was very active with our children and the community when he began coaching during our children's school years.  He always made time to coach our son's teams in Little League from second grade through junior high. Jim also coached our daughters' teams in soccer, softball and basketball.  Our son, Jeff, often assisted Dad with coaching duties.  Jim spent many hours coaching while I cheered our kids' teams to many victories!

Ever since I met Jim, I have watched him and shared with him the value of family, with great love and respect for our parents, siblings, aunts, uncles, cousins and friends.  Jim enjoys many friendships, some dating back to his early childhood.  He is well respected by his peers.  These individuals who have been a part of Jim's life, myself included, have been witness to a kindhearted, most generous and very hard working man.

Jim has been very proud of his lifelong career in the real estate business.  During the years I have spent with Jim, I have heard nothing but admiration from his many business associates and peers, praising him for his honesty, generosity and fair nature.  I have never known Jim to take advantage of anyone for his own monetary gain.

I believe in my heart that Jim would never intentionally and knowingly enter into any business dealings against the law.  Jim can be best described as a loving husband and father, someone always there for people he cares about and always ready to lend a helping hand.

I appreciate the opportunity to write this letter on Jim's behalf.

Sincerely Yours,

*Carol Ann Appenrodt*

Carol Ann Appenrodt

72 Peacock Drive
San Rafael, CA  94901

E X H I B I T   G

February 10, 2018

Honorable Charles R. Breyer

USDC, Northern District of California

450 Golden Gate Avenue, 17th Floor

San Francisco, Ca 94102

Your Honor,

I am writing to you regarding the case against Jim Appenrodt. My name is Steve Morello and I have recently retired from my job of 38 years in the Food Service industry. Jim and I have been friends for over 55 years. We met at St. Veronica's Catholic Grammar School in South San Francisco, we were altar boys, played sports and grew up during a great time in this country.

We bought our first house together in the mid 70's and during that period I met my wife Janet (we have been married for 38 years & have 4 grown children & 4 grandchildren) and Jim, too, also met his wife Carol (they have been married for 36 years and have 3 children.

Not many people can say that they have been friends with someone for that length of time and I am proud to say that Jim Appenrodt is my close friend. I know he will always be there to support my family & myself. Jim is the Godfather to my youngest son who has learning differences. Jim has always been there for him, whether its taking him to a game or giving him tickets to the Giants or Warriors, (he loves sports), as well as much needed life advice coming from someone other than his parents or siblings.

Whether its his family, friends or his job, Jim continues to be dedicated throughout his life.

I understand Jim made an error in judgement. I am pretty sure he has never been in trouble before. I know from discussions with him that he is very sorry for what has happened, and this is out of character for him. He is a good soul that made a mistake and as his friend I hope you understand my words in this letter.

Sincerely,

Steve Morello

1601 Cypress Ave.

San Mateo, CA  94401

E X H I B I T   H

# Antonio Castellucci

14 Pelican Point Road - Belvedere, Ca 94920 - 415 948 4595

February 2, 2018

Honorable Charles R. Breyer
USDC, Northern District of California
450 Golden Gate Ave, 17th Floor
San Francisco, CA 94102

Dear Honorable Charles R. Breyer,

My name is Antonio Castellucci, I've been Jim Appenrodt's personal friend for 20 years and I feel as though I know him and his family very well.  Our families socialize together, travel together and are involved in our children's lives as milestones occur.

In reference to the matter at hand, I have no knowledge of the case. I can; however, speak to the moral character of Jim as a person. He is and has always been thoughtful, a loving and involved father and a productive member of our society.

Despite the situation, I personally vouch for him and believe his character to be good.

Over the last 20 years, in many occasions I've called Jim for advice, I've always respected his work ethic, his efficiency, generosity and kindness.

Sincerely,

Antonio Castellucci